United States v. Mulet and Marrero, and good morning. May it please the Court, my name is Robin Farnsworth and I represent Ms. Marrero. Ms. Marrero raises one issue, which my colleague, Mr. Mulet, has also adopted, which is whether... Ms. Marrero raises one issue, which her co-appellant, Mr. Mulet, has also adopted, which is whether the appellants were denied their constitutional right to present a defense and rebut the government's case. But the appellants were precluded from presenting any evidence about the financial state of their business to show that a money motive was not reasonable in light of the legal and legitimate flow of money and business into their company, which, if permitted, would have raised a reasonable doubt as to their intent. The government and the district court misconstrued the defense evidence as good conduct or propensity evidence prohibited by the rules of evidence when, in fact, it was relevant evidence permitted by Rule 401 for the purpose of rebutting the government's argument of a money motive. It was also offered to show a lack of knowledge and opportunity because evidence of the appellant's legitimate, thriving business would make it less likely that they would have the time or the opportunity to know the details of criminal activity involving a handful of clients in the middle of providing a wide variety of legal immigration services for so many others. The government highlighted the time and care the appellants took to prepare their clients for interviews with immigration, suggesting that this showed an intent to defraud. But the appellants were denied the opportunity to present a witness, Ms. Cabrera, who could explain the innocent, non-criminal reason and purpose for the interview preparation and help them. What was the timing of Cabrera's involvement with the defendants in relationship to the charged conduct in the indictment? How close in time was that? She knew the defendants before the time period of the alleged conspiracy, Your Honor, but she also knew them during that time period. She was being presented as an example of other clients had also given the same information to Ms. Morero and Mr. Millett. If I understand it right, she was offered by the defense both as a substantive witness and as a character witness, right? That is correct, Your Honor. And the character testimony went to honesty, veracity, and law abidingness. That's correct, Your Honor. And she was barred from testifying both substantively and as a character witness? That's correct, Your Honor. And the proffer at the time that the defense made was the relevance of her testimony was that it tended to show that Ms. Morero had received feedback from clients who were legitimately married and legitimately together and that they had had difficulties telling Ms. Morero and Mr. Millett how difficult these interviews were with immigration, which would explain why they went into such trouble to help prepare. Let me ask you a question. Just help me with the record here. I understand the theory behind not permitting her to testify substantively to offer good acts to rebut the charge of intent, etc. But what was the rationale offered, if any, for barring her from testifying as a character witness? Was any offered? Did the court say anything about why she would not have been permitted to testify about veracity and law abidingness? No, Your Honor. At that point, the district court felt that the information was cumulative. There had already been some evidence presented with respect to character, and the district court found that it was cumulative. She was prevented from testifying, but the government was permitted to give the jury the impression that TT&T, this company, was a sham company dealing only in sham marriages, and that there was no source of legitimate income for the company. But the defendants were not permitted to rebut or defend against this impression. And because that evidence was offered for a relevant non-propensity purpose, it should have been permitted. And excluding that evidence tied the appellant's hands in presenting an effective defense, and essentially denied them a fair trial. And that is Ms. Marrero's argument and also Mr. Millett's. No other questions? No, thanks very much, and you've reserved two minutes plus the balance of the time you've got for rebuttal. Thank you. Good morning. My name is Manny Casseville, and I represent the appellant, Rolando Millett. Mr. Millett has two additional issues, one dealing with sentencing, the other one dealing with common silence. Under the case of United States v. Keene, correctly cited by the government, the question this court has to ask is if we assume that the district court made an error in calculating the guidelines, is the sentence still substantively reasonable? If we assume that the district court made an error in calculating the guidelines, the guidelines would have been 21 to 26. Let me just ask you sort of a threshold question in that regard, and assume for purposes of my question that you're right and the district court made a mistake in the calculations. The district court said that it would have imposed precisely the same sentence, regardless of that issue and how those calculations were completed. The result would have been the same. How do you handle that? How do you get over that, even assuming you're right, does it matter? If the sentence would have been the same and if the court was otherwise lawfully permitted to do exactly what it did do, where was the fatal or reversible error? Your Honor, that is the issue that was addressed by the court in United States v. Keene, and what that decision tells us is that what we have to do is evaluate the sentence and determine whether or not it was substantively reasonable. If we assume that the calculations were in fact wrong, the applicable guidelines would have been 21 to 27 months. The sentence that was imposed was 48 months. What was the statutory exposure? Your Honor, it was great. There were four convictions of substantive counts. I believe each of those carried a five-year max. There was a conviction on a conspiracy count which carried, and I may be wrong about the substantive counts, but the exposure was a lot greater than the 48 months. I think it's where we're going with the question, so let me answer it that way. The reasons given by the district court for the upward variance was that Mr. Millett was making a mockery of the people who followed the rules. The fraudulent applications that he was part of filling out, and already overburdened system. She wanted the sentence to speak loudly and clearly to the community that such abuses would not be tolerated. I respectfully suggest that the actions of the district court belie those reasons, the stated reasons. Now, none of the aliens in this case received any jail time, and they were the ones that actually caused the applications to be filed into the overburdened system. The Cubans received some jail time. All, however, were within the guidelines. Yet, without the Cubans, none of those applications would have been possible, let alone filed. All of the aliens, with the help of the Cubans, could be said to be the ones that were making a mockery of the people that followed the rules. Plus, Your Honor, the government did make a recommendation that the sentence should be within the guidelines. Now, considering I am running out of time very quickly, I'd like to address the issue regarding comment on silence. Obviously, we have to deal with the precedent that this court has set in United States v. Rivera. However, Rivera has been disapproved of by, or at least there is some disapproval in that it's been described as misguided by Judge Gordon. Let me ask you how I handle it. Even assuming, arguendo, that I were to agree with you, I'm still bound by that pronouncement by the circuit, unless it was either overturned in bonk, or the Supreme Court of the United States had overruled it, or its reasoning had been so completely gutted as to abrogate the whole thing. And I'm not sure you can say any of those things about Rivera. Your Honor, that is correct. However, I can say that Rivera is a bit different than the case here. Rivera dealt with actual silence, as did Wilchcombe. This case, we have an actual assertion by Mr. Millett of his right to remain silent. And I do not believe that this court has ever addressed the significance of that difference. And the Supreme Court case, or at least the dissenting opinion, in Salinas v. Texas, gives a very well thought out analysis, and their argument, or their opinion, is based upon the premise that there was an actual assertion of the right to remain silent. And I am over the time, Your Honor, so unless there are any other questions. Thank you, Your Honor. May it please the Court. My name is Ann Schultz. I'm an assistant United States attorney, and I represent the United States in this matter. Also present at council table is assistant United States attorney Ann McNamara, who is one of the trial attorneys in this case. If I could, I would like to start with the sentencing issue and clear up just a couple of unintentional misstatements. The statutory maximum for each of the substantive counts was actually 120 months, and the conspiracy was, as noted, 60 months. So when looking at the substantive reasonableness, it is one of the factors that the court could certainly consider that the 48-month sentence was far below the statutory maximum, even for the conspiracy count. In addition, the sentencing transcript shows that the district court judge exercised extreme care and thoroughness in going through the 3553A factors, and because, as council noted and this court noted, under Keene, this court need not consider the appropriateness of the guideline calculation. The substantive reasonableness is more than supported by the careful consideration of the 3553A factors articulated by the district court. As to the argument as the comment on the right to silence, as the government agrees with council that that is controlled by this court's 1991 decision in United States v. Rivera, as Judge Marcus, you noted, the United States position is that Salinas v. Texas in no way overruled the decision, nor did it abrogate it to the point where it would be reconsidered by this court. Therefore, in light of the court's binding precedent, the government would ask that that would be affirmed on that point. Of course, in this case, the comment is, when LaVoie spoke to Mullet, the comment he made was, quote, he had nothing to say about the allegations of marriage fraud. What about the actual language that he used in relationship to the other statements in the other cases? Do you see any distinction in the actual words he used? Well, in going and looking at it under Salinas, assuming for purposes of your question that Rivera does not control, and I agree with you, Rivera was a straight silence case. It wasn't a situation where the defendant and Rivera invoked. In this case, and that is a point that is valid, but because Rivera linked and made the blanket statement of linking it to the Miranda rights, the government would still, even though that's a different belief, that in this situation it would still control. Going to the question, though, of whether or not that statement is different, we do agree that in this situation it is a distinction. Let's suppose the witness had said, in a non-custodial setting, no obligation to give Miranda warnings. Law enforcement officer walks up and says, what do you have to say, Marcus? Marcus says, I have nothing to say to you. I invoke my privilege against self-incrimination found in the Fifth Amendment. Could the agent then testify in a court of law later that the witness, now defendant, said, I have nothing to say to you. I invoke my privilege against self-incrimination? Do you think that could come in? No. Your Honor, as I understand your hypothetical, that is a clear statement by a defendant invoking his right to counsel. The United States position is, if you have the first prong met, and there is a statement that, a clear invocation of saying, for example, different than Mr. Millett said of, I don't want to answer any questions. Clearly, if he said, I invoke my right to my Fifth Amendment privilege, then in the United States view, if there is a clear and ambiguous invocation of the right to counsel, it would not be. It wouldn't matter that it was non-custodial. It wouldn't matter that Miranda was not given and there was no obligation to give. Mere incantation of the words, I invoke the Fifth Amendment privilege against self-incrimination is enough. To bar that evidence from coming in because . . . of Griffin v. California that this Court has never said and that the Supreme Court in Salinas v. Texas specifically did not reach. I understand, but the position of the United States of America is that if a witness, then defendant, as witness in non-custodial setting, just uses the words, I invoke my privilege against self-incrimination on the Fifth Amendment, that cannot be used in a court of law against him. Yes, Your Honor. Okay, so tell me if that be the case, what's the difference from John Q. Citizen who says, I have nothing to say to you, officer, about . . . you want to question me about the allegations of marriage fraud. I have nothing to say about that. Your Honor, if I could, taking that back to the facts in this case. One of the problems with the record in this case that is extremely abbreviated, if you look at the testimony of Agent LaVoie when she was on the stand, the question was phrased in terms of what, if anything, first did Ms. Marrero say and then afterwards went to Millett. But if you look at Agent LaVoie's testimony, there isn't actually even a question there. Instead, what you have is her testimony that she handed the search warrant to Millett and that she . . . She basically unsolicited blurted out the words, I have nothing to say. I mean, how does it happen that the words come out? Was there an interrogation? What triggers it? In this case, we don't know specifically what triggered it. What we have, as I said, when you look at the testimony of the agent, it's no question is reflected at all. It's that when she was there, she was serving the search warrant, that she advised Millett of the allegations against him and Marrero and the business regarding marriage fraud and he said, I have nothing to say to that. That's all we have on the record. Then when you have the objection and later when they're arguing the motion for mistrial, the prosecutor informed the judge as part of the argument that that statement by Millett was made in response to a very basic question. We don't know what the question was and it's one of the reasons why this case, I believe, is a particularly poor vehicle for this court to tread into issues of first impression, especially in light of Marrero, but also because this court, if you analogize to the case law in the Miranda setting, which the court talked about in Salinas, where you look at whether or not it's an unambiguous invocation of the right to silence. We don't have the actual question asked, if any. We don't have everything really leading up in the contest. This court has noted and the Supreme Court has suggested that there can be important nuances in the very question itself or what preceded to have the court make that very fact. So what you're saying to us is even assuming arguendo that the Fifth Amendment privilege was violated, you say the error is harmless. Correct, Your Honor. Tell me why. Your Honor, in this case, I believe that it's clear that it's harmless, even applying, of course, the constitutional beyond a reasonable doubt standard. You had multiple witnesses who testified for the inside view here. You had Gomez, you had Pereira, you had Yolmeza. Not only did they testify and directly link Millett, as well as Marrero, with co-conspirator statements, and Key in particular directly to Millett. Their testimony was strikingly similar on very important facts. For instance, that in each case it was basically the same story. They would go, they had to pay only in cash. It had to be no talking over the telephone except in discrete code words. That they should never contact anyone except Marrero, and if she wasn't there, Millett. They testified that although Marrero did most of the talking, Millett was always there. He was there at every key time. He was there when money was handed over in cash. He was there giving instructions. He was the one who notarized the marriage certificates. He was the one who actually filled out, signed, and filed the applications for adjustments, which are the crux of this case. He's the one who officiated at all the marriages. He and Marrero insisted that they have nice little photos taken of him purporting to sign the marriage certificate, even though in each case it had been executed days or weeks before. In particular, if you look at Government Exhibit 3 in this case, there were three undercover recorded conversations with Gomez with both defendants. Most of the time you have Marrero talking, although Millett is present. In the third one, Government Exhibit 3, you have statements specifically by Millett talking about the fact that, you know, very, very angry that Gomez has gone to a lawyer and revealed the scheme. He stops Marrero in a real change from the ordinary course where he let her talk and played the supportive role. He takes over, and she acknowledges, you are the one, you know the law, and lets him speak. And his statements in Government Exhibit 3, completely, all three, Government Exhibits 1 through 3, completely corroborate the testimony of Gomez. That corroboration, along with the detailed, consistent, related testimony of all of the defendants, is more than sufficient to show this is harmless beyond a reasonable doubt. Why don't you turn to the other issue raised by Ms. Farnsworth? Yes, Your Honor. I think it's very important again to look at the context. This initially rose in a situation of a pre-trial motion in limine by the government, and then you had a pre-trial hearing where it was discussed, and the court made initial findings, but very careful, wanted to read the law before entering her pre-trial order. And even then, the court made it very clear, and I think importantly, for one thing, she noted that she made a distinction between, for example, if during the trial they wanted to put the evidence in, that there wasn't an opportunity for her to commit the crime. That that was very different than looking at the motive intent aspect. But I'd like to also talk about, Your Honor asked a question regarding Cabrera, and I believe the transcript part of that is at Transcript 617, but when they were talking about it, the judge absolutely said cumulative, but that wasn't really the only reason. I think when you read the full comments of the district court judge, part of it was she had taken such care, and you'd had such careful litigation all the way through, from the motion in limine at various times when evidence would come in, and then again as the defense presented the case. And what happened here was Cabrera was called and began to testify, and the initial questions and the testimony that were elicited was all about her business relationship with the defendant. And so when the objection was made, and they were starting to talk, the district court judge noted they could have very carefully, if this had been presented to her, she would have had the opportunity to help fashion the evidence in such a way that the character evidence could be brought in without causing confusion. Right, but what would be cumulative about Cabrera saying, I know the defendant's reputation in the community for honesty and veracity, the reputation was the defendant was an honest and law-abiding citizen, and I also know the defendant personally, and I have a personal opinion  There's nothing cumulative about that, is there? Well, it would have been cumulative in the sense that two other witnesses testified that they knew her socially, they knew her reputation in the community, and that she was honest. The two other character witnesses testified. Correct, and the judge confirmed that there were other character witnesses. The third one became too many. Yes, Your Honor, although I do think also when you read the judge's comments, she felt that there had been enough, and it was cumulative, and she was also very careful with the record before the jury to make sure that there wasn't that confusion in terms of the fact that the legitimate businesses, she was concerned about the inferences that the jury would necessarily draw in light of the way the testimony was elicited before there was the objection and the discussion on the character aspect. I think it's also important to note that as counsel was arguing, and they argued in the district court, that the whole key point, and I think really fairly the true focus initially when Cabrera was called, was the fact that she could testify that the reason they were spending all this time and going over the questions and prepping them for the interviews was because they knew from talking to Cabrera and witnesses that, if I could finish, I'm sorry, I see my red light, that how important that interview was, and that even legitimate marriages could have a rough time of it at the interview if they hadn't really prepped. But that's really a mis- And her testimony on that, her involvement, and when she would have relayed that to Cabrera was a full two years before the beginning of the conspiracy period. As Your Honor asked, that testimony with Cabrera was like 2006 and 2007. The very beginning of the conspiracy in this case was 2009. It went to 2009 and 2014. So the district court's exclusion of that one of three character witnesses was reasonable and not an abuse of discretion, and I see my time is up unless the court has further questions. I would ask that the court affirm for the reasons stated in the government's brief in an oral argument. Thanks very much. The court had asked about the district court's ruling in preventing Ms. Cabrera from testifying, and what the court said, which is docket entry 617, page 118. She ruled that any additional reputation testimony would be cumulative and would be, quote, in violation of my order, meaning her in limine order. So she was precluding it based on the government's motion in limine and her ruling on that, which has nothing to do with reputation or character evidence. But that was the reason- Were there two other character witnesses who had testified about the defendant's character for honesty and law-abidingness? Yes, sir. There were two other character witnesses who had done that. But in any event- What was your proffer about the other business income you wanted to introduce? Did you make a proffer in that regard? Yes, Your Honor. How detailed was it, and where can I find it? Docket entry 423, pages 4 and 5. The defense provided the district court with a detailed summary of exactly what they wanted to introduce at trial regarding the business. Was it gross income or how many other marriages you'd done that were legitimate? What was the gist of the evidence? They wanted to be able to- There was a variety of documents that were seized during the search. There were 23 boxes that were seized. Yes, ma'am. And they wanted to be able to use evidence that was seized in that search to be able to show that there were a number of applications that were not marriage applications, that they provided a variety of immigration services and that they had provided those services for years and that they had a legitimate flow of money- What other type of services? Because they were apparently- At sentencing, they said there were 94 marriages they had done between Cubans and non-Cubans, using the Cuban status to get the non-Cuban and LPR status. Yes, ma'am. In those boxes, there were 94 such marriages. I know we only went to trial on three or four. Yes. On page 5 of the proffer that the defense gave to the district court, they list by boxes the number of immigration petitions. They had applications that were for immigration- But were they all about marriages? Because there were 94 in those boxes. There were 94 in those boxes, but the other boxes list 301 in Box 2340 and Box 19, 137 in Box 18, 312- But if you'd gotten into other businesses and other things they did, the government could have put in all these 94 other marriages. Did they put in all the other 94 marriages? No, ma'am. Or they just focused on the three that were at trial? They only focused on the four that were at trial. But if you get into the general business, couldn't the government then have come in and said, Look, there are 94 Cuban, non-Cuban marriages to help them get- Certainly, the government raised that inference anyway because when the government agent testified, he testified that there were 100 marriage petitions and raised the inference that all of them were fraudulent. The government said they had sentencing. I don't know about the trial, but they had investigated them and they knew how many of those were fraudulent. The majority of them were fraudulent. Certainly, they could have brought in other evidence, Your Honor. The point is the defense was- I'm just trying to evaluate how helpful getting into so-called other businesses as opposed to what they were trying would have been to your client. They were just trying to show that they had a legitimate source of income, Your Honor, and that it was a very busy, thriving, legitimate business, and they needed that evidence to be able to rebut the government's evidence. Well, did it not come in that there was a busy, thriving business there? Not one word about that came in? Well, the only thing that came in is the government's argument that this was a- let me get the exact- that it was a one-stop marriage fraud shop is what the government argued in closing. They argued that it was a factory of fraud, a marriage mill, and that they were doing this for the money. Money was the main ingredient for the crime, and yet the defense was not able to show that they had a legitimate source of money and that there was a legitimate- Let me ask the question in a slightly different way. We're looking at this for abuse of discretion, I suppose. Why couldn't the judge reasonably say that I'm not going to let you put in evidence of good marriages, let's say there were a hundred of them, to counteract these transactions, which is what this case is about, because if I do let you put in 96 other marriages that are not charged here, I move the entire center of gravity of the case into something else, and it would take weeks and weeks and weeks, because then we're going to wind up trying the wisdom of each of these other transactions, and they're really not at issue in this case, whether they were good, whether they were bad, whether they were indifferent, and presumably the government would have controverted at least some of them, it would have taken what was- how long did this trial take? It was a 15-day trial. It could have turned it into four months, five months, six months. Why wasn't the judge within her discretion to say it's collateral, it moves the center of gravity away from what's really at issue in this lawsuit and is reasonably likely to create great confusion among the fact finder? Maybe that's right, maybe that's wrong, but why couldn't a judge say that and be within her discretion? Your Honor, a judge could certainly consider that, but the point in this matter, it wasn't a collateral matter. This was intrinsic to what the government- Well, it was collateral in the sense that nobody was claiming that marriage A, B, or C was no good or was a fraud, the government just said these transactions were plainly fraudulent. Yes. We're not saying anything about those. Yes, but the government also characterized the whole company as this is just like a marriage fraud factory and did not let the defense explain that they had a legitimate busy business and that it was unlikely that they could have known what was going on or been involved in what was going on because of all of the legitimate business that they did and that was the argument that they were trying to make and they should have at least been able to present a small portion of that to the jury so the jury could have considered it. As it was, the jury was able to hear no evidence that there was anything legitimate going on at TT&T and because of that, the defendants were prevented from presenting an effective defense or any defense at all. Thank you. Thank you very much. This court asked how did the statement by Millett come up. The question that was asked on redirect examination by the government of Agent LaBoye was, what, if anything, did Ms. Marrero say to you? The answer by Agent LaBoye, I provided her a copy of the search warrant and told her the allegations against her and her husband and the business and she denied the allegations. Next question. And as for Mr. Millett, what did he say to you? Mr. Millett said, again, I gave him a copy of the search warrant and told him the allegations and he said he had nothing to say about that. That is how that statement came up. Assuming arguendo that there was error, why wasn't it homeless beyond a reasonable doubt, given the overwhelming evidence in the case? Your Honor, as a trial lawyer, we sometimes think of cases where the government has a good case and sometimes where the government has an overwhelming case. I would characterize this as the government having perhaps a good case. But I can also characterize the evidence that was presented as legitimate business dealings in the context of illegal motives. I stated that in my brief. The context for the illegal motives was provided by the witnesses, the aliens that testified for the government. Those aliens were admitted liars. They had lied many times before to the government. They admitted lying in court. And some of those aliens were serial, either brides and grooms. Some had been married before at least once, sometimes maybe even twice, in an effort to get legal status in this country. So I submit that their credibility was... What about the payments? Were they lying about the fact that they paid $18,000 for them to find a Cuban they could marry to try to stay here? Your Honor... Did you prove or anybody contest? And one person paid $32,000 to the defendants, I thought. The only evidence... Was that contested? It wasn't contested. But the only evidence of that came from the mouths of the aliens who had reasons to lie and who had credibility. And did you argue to the jury the government hadn't proved the payments occurred or did everybody kind of accept that as the truth but saying, well, your clients thought it was a legitimate marriage? What I argued to the jury, Your Honor, was basically what I'm saying to the court today, which was that the context, this illegal context to these legitimate business dealings, is being provided to the jury by admitted liars. If I may address... So implicitly you were saying that they didn't really pay the money? I didn't say that, Your Honor. Okay. It's the amount of the money, and nobody seemed to dispute that they then introduced... I agree, people who had lied, who were here illegally, they'd lied to the government many times about their status, all this, and they filed fraudulent marriage papers. But the problem was they said they paid your clients to help them and your clients facilitated it all. Your Honor, my... And so your defense was, well, we didn't really know it was fraudulent. Is that the defense? Yes, that was part of the defense. And yes, my client was paid for his services, but it was my position, Mr. Millett's position, that the services he was providing were legitimate business services. Now, with regard to, if I may... You may. With regard to the harmless error, I've already stated that the context was given by admitted liars. The most troubling thing for me, for Mr. Millett, are obviously the recordings. But I'd like to clarify that if I could. There were three recordings. The first one occurred in January. That's Government Exhibit 1 was introduced into evidence. In that recording, you do hear Mr. Millett, but what you hear is Mr. Millett in the background conducting business. He is talking on the phone to other people, not to Mr. Gomez. Mr. Gomez was speaking to Ms. Morero. In the second conversation, which occurred in March, and that was introduced as Government Exhibit... But there are awfully inculpatory things said in the conversation, certainly within your client's earshot. Well, that wasn't established. And, in fact, if you hear... It wasn't established that it was within earshot or what was said was inculpatory? That he was within earshot. Okay. In fact, if you hear the recording, and, in fact, if you look at the transcript, it describes what Mr. Millett, or you can glean what Mr. Millett is doing while Mr. Gomez is speaking to Ms. Morero. He's on the phone conducting business. He is talking to other people at the office. So... I got it. What about the others? The second call, Mr. Millett is not even recorded on that conversation because what happened, and this also can be gleaned from listening to the recording. What happened was Ms. Morero and Mr. Gomez stepped outside of the business establishment, and while outside they had their conversation. Mr. Millett is not even in the second conversation. What about the third one? The third one is a little bit more troubling, and I have to admit it. He does make some statements in that case, specifically, for example, you shouldn't tell a lawyer that you did this. But in the same conversation, Mr. Millett is offering, or at least told Mr. Gomez, I was going, we were going to get you a lawyer. So, although there are some incriminating statements in that third recording, there's also some statement, or at least some mention. But there's more than one incriminating comment, wasn't there? Yes, there were a few. I've got it. Thank you. Thank you very much. We appreciate your efforts, counsel, and I did note that you were court appointed, and we very much appreciate you taking on the burden of vigorously representing your client.